

**FILED**

SEP 05 2018

9-5-18

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, *ex rel.*
JORI GLASPER and KRYSTAL WYCKOFF,

      Plaintiff-Relators,

      v.

ST. JAMES WELLNESS REHAB & VILLAS,
LLC, EXTENDED CARE CONSULTING, LLC,
EXTENDED CARE CLINICAL, LLC, ESTATES
OF HYDE PARK, LLC, CHATEAU NURSING
AND REHABILITATION, LLC, ERIC
ROTHNER LIMITED PARTNERSHIP, LEMONT
NURSING AND REHABILITATION CENTER,
LLC, TRI-STATE NURSING &
REHABILITATION CENTER, INC., SOUTH
SUBURBAN REHABILITATION CENTER, LLC,
PRAIRIE MANOR NURSING &
REHABILITATION CENTER, LLC,
LAKEWOOD NURSING & REHABILITATION
CENTER, LLC, BEECHER MANOR NURSING
AND REHABILITATION CENTER, LLC, BRIAR
PLACE NURSING, LTD., COUNTRYSIDE
NURSING & REHABILITATION CENTER, LLC,
LITTLE VILLAGE HEALTHCARE CENTER,
INC., PRAIRIE VILLAGE HEALTHCARE
CENTER, INC., SNOW VALLEY NURSING &
REHABILITATION CENTER, LLC,
EDGEWATER CARE & REHABILITATION
CENTER, INC., KENSINGTON PLACE
NURSING & REHABILITATION CENTER, LLC,
RUSHVILLE NURSING & REHABILITATION
CENTER, LLC, TIMBER POINT HEALTHCARE,
INC., SOMERSET PLACE, LLC, MAJOR
HOSPITAL, DYER NURSING AND
REHABILITATION CENTER, LLC,
LINCOLNSHIRE HEALTH &
REHABILITATION CENTER, LLC, and DLS
FINANCIAL CONSULTING LLC

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Filed Under Seal and In Camera

**1:18-cv-06063**
**Judge Ruben Castillo**
**Magistrate Judge Daniel G. Martin**

Jury Trial Demanded

## COMPLAINT

Now comes the United States of America, on the relation of Jori Glasper and Krystal Wyckoff, and complains of Defendants St. James Wellness Rehab & Villas, LLC, Extended Care Consulting, LLC, Extended Care Clinical, LLC, Estates of Hyde Park, LLC, Chateau Nursing and Rehabilitation, LLC, Eric Rothner Limited Partnership, Lemont Nursing and Rehabilitation Center, LLC, Tri-State Nursing & Rehabilitation Center, Inc., South Suburban Rehabilitation Center, LLC, Prairie Manor Nursing & Rehabilitation Center, LLC, Lakewood Nursing & Rehabilitation Center, LLC, Beecher Manor Nursing and Rehabilitation Center, LLC, Briar Place Nursing, Ltd., Countryside Nursing & Rehabilitation Center, LLC, Little Village Healthcare Center, Inc., Prairie Village Healthcare Center, Inc., Snow Valley Nursing & Rehabilitation Center, LLC, Edgewater Care & Rehabilitation Center, Inc., Kensington Place Nursing & Rehabilitation Center, LLC, Rushville Nursing & Rehabilitation Center, LLC, Timber Point Healthcare, Inc., Somerset Place, LLC, Major Hospital, Nursing and Rehabilitation Center, LLC, Lincolnshire Health & Rehabilitation Center, LLC and DLS Financial Consulting LLC as follows:

## I.   INTRODUCTION

1.      This action seeks damages and civil penalties arising from violations of the federal False Claims Act, 31 U.S.C. §§3729, *et seq.*, the Illinois False Claims Act 740 ILCS 175, *et. seq.*, the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 et. seq., and the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.7 et. seq.

2.      Relator Jori Glasper was a Social Services Director at St. James Manor & Villas Skilled and Assisted Living ("St. James Manor") from August 2015 to August 2017. Relator Krystal Wycoff was the Therapy Program Director at St. James Manor from March 2017 to

2

November 2017. St. James Manor is operated, serviced, owned, and managed by the Defendants. Relators Glasper and Wyckoff have substantial knowledge of the various frauds committed by the Defendants.

3.    Starting from at least 2015 through the present, Defendants engaged in various schemes to create false records and to cause the submission of false claims for unreasonable, unnecessary, or unskilled therapy, or for therapy that did not occur as reported, ultimately cheating Medicare out of millions of dollars. These schemes include:

- Presumptively placing patients in the highest therapy reimbursement level, rather than relying on individualized evaluations and/or assessments to determine the level of care most suitable for each patient's clinical and/or rehabilitative needs;

- Scheduling and reporting the provision of therapy to patients even after the patients' treating therapists had recommended that they be discharged from therapy and/or the facility;

- Delaying the discharge of patients in order to bill for unnecessary therapy; and

- Providing a level of therapy to patients that was not medically necessary and/or went materially beyond the level recommended by the patients' therapists.

4.    When Relators Glasper and Wyckoff raised concerns about these schemes, Defendants retaliated against them by cutting Relator Glasper's work hours while requiring her to do the same amount of work and terminating Relator Wyckoff from her position as Therapy Program Director.

## II.    PARTIES

5.    Relator Jori Glasper was the Social Services Director at St. James Manor for the past two years. In her capacity as the Social Services Director, she reviewed patients' therapy and progress notes, assessed treatment needs, prepared discharge papers, coordinated and ordered all services and equipment needed by patients who are ready to be discharged, and was the facility's point of contact for patients' friends, family, and/or individuals with the power of attorney. As such, as part of her regular duties, Ms. Glasper has valuable knowledge regarding the assessment, care, and billing practices of Defendants for Medicare patients from admission through discharge.

6.    Ms. Glasper has worked in social services since 2009. Before she was hired by St. James Manor, Ms. Glasper spent four years as a case manager for the Indiana Department of Child Services. In that capacity, she identified and provided children in need with necessary services to ensure their well-being. Ms. Glasper is a resident of Indiana.

7.    Relator Krystal Wycoff was the Therapy Program Director at St. James Manor from March 2017 to November 2017. As the Therapy Program Director, she reviewed patients' occupational therapy and progress notes, routinely met with interdisciplinary teams to develop discharge plans, and coordinated with all services at the facility to ensure patients' needs were addressed. As such, as part of her regular duties, Ms. Wycoff has valuable knowledge regarding the assessment, care, and billing practices of Defendants for Medicare patients from admission through discharge.

8.    Relator Krystal Wyckoff has been a Certified Occupational Therapist Assistant (COTA) since 1997 and been a therapy program manager for over 15 years. As an experienced therapy program manager, she understands the Federal, State and Local laws, rules and

4

regulations related to therapy service delivery in SNFs. Ms. Wyckoff is also knowledgeable of the principles of rehabilitation and of life development, growth, and recovery, and able to develop therapy plans and goals accordingly, and to identify patients who are not good candidates for therapy.

9.      Defendants are skilled nursing and immediate care facilities in Illinois and Indiana or are the entities that operate these facilities. All of the Defendants are owned by Eric Rothner and/or by one or more of his family members. Mr. Rothner has been previously accused of fraud and breach of contract in relation to the nursing homes he owns. Mr. Rothner is also well known for setting up complex ownership and operation structures in order to diffuse liability for fraud and breach of contract. As described in more detail below, many of the nursing homes owned by Mr. Rothner are run by separate corporations, whose ownership is divided among family members, business associates, and trusts, with each corporation having a board of directors whose names are not public information.

**Defendant Skilled Nursing and Immediate Care Facilities in Illinois**

10.      Defendant St. James Wellness Rehab & Villas, LLC is a skilled nursing and intermediate care facility doing business as St. James Manor & Villas, located in Crete, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2014.

11.      Defendant Estates of Hyde Park, LLC is a skilled nursing and intermediate care facility doing business as Estate of Hyde Park, located in Chicago, Illinois. The limited liability company is headquartered in Chicago, Illinois and was incorporated in 2014.

12.      Defendant Chateau Nursing and Rehabilitation, LLC is a skilled nursing and intermediate care facility doing business as St. James Manor & Villas, located in Crete, Illinois.

5

The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2014.

13.     Defendant Eric Rothner Limited Partnership is a skilled nursing and intermediate care facility doing business as Wheaton Care Center, located in Wheaton, Illinois. The limited partnership is headquartered in Evanston, Illinois and was incorporated in 1993.

14.     Defendant Lemont Nursing and Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Lemont Nursing and Rehabilitation Center, located in Lemont, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2002.

15.     Defendant Tri-State Nursing & Rehabilitation Center, Inc. is a skilled nursing and intermediate care facility doing business as Tri-State Nursing Rehabilitation Center, located in Lansing, Illinois. The corporation is headquartered in Evanston, Illinois and was incorporated in 1995.

16.     Defendant South Suburban Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as South Suburban Rehabilitation Center, located in Homewood, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2006.

17.     Defendant Prairie Manor Nursing & Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Prairie Manor Nursing and Rehabilitation Center, located in Chicago Heights, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2002.

18.     Defendant Lakewood Nursing & Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Lakewood Nursing and Rehabilitation Center,

located in Plainfield, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2002.

19.     Defendant Beecher Manor Nursing and Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Beecher Manor Nursing and Rehabilitation Center, located in Beecher, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2005.

20.     Defendant Briar Place Nursing, Ltd. is a skilled nursing and intermediate care facility doing business as Briar Place, located in Indian Head Park, Illinois. The corporation is headquartered in Evanston, Illinois and was incorporated in 1986.

21.     Defendant Countryside Nursing & Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Countryside Nursing & Rehabilitation Center, located in Dolton, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2014.

22.     Defendant Little Village Healthcare Center, Inc. is a skilled nursing and intermediate care facility doing business as Little Village Nursing & Rehabilitation Center, located in Chicago, Illinois. The limited liability company is headquartered in Chicago, Illinois and was incorporated in 2017.

23.     Park House Nursing and Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Park House Nursing and Rehabilitation Center n/k/a Little Village Nursing & Rehabilitation Center, located in Chicago, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2009.

24.     Defendant Prairie Village Healthcare Center, Inc. is a skilled nursing and intermediate care facility doing business as Prairie Village Healthcare Center, located in

Jacksonville, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 1997.

25.    Defendant Snow Valley Nursing & Rehabilitation Center, LLC was a skilled nursing and intermediate care facility doing business as Snow Valley Nursing & Rehabilitation Center, located in Lisle, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2002.  The company was involuntarily dissolved in 2015.

26.    Defendant Edgewater Care & Rehabilitation Center, Inc. is a skilled nursing and intermediate care facility doing business as Sheridan Shores Care & Rehabilitation Center, located in Chicago, Illinois. The corporation is headquartered in Evanston, Illinois and was incorporated in 1993.

27.    Defendant Kensington Place Nursing & Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Kensington Place Nursing & Rehabilitation Center, located in Chicago, Illinois. The limited liability company is headquartered in Chicago, Illinois and was incorporated in 2013.

28.    Defendant Rushville Nursing & Rehabilitation Center, LLC is a skilled nursing and intermediate care facility doing business as Rushville Nursing & Rehabilitation Center, located in Rushville, Illinois. The limited liability company is headquartered in Evanston, Illinois and was incorporated in 2015.

29.    Defendant Timber Point Healthcare, Inc. is a skilled nursing and intermediate care facility doing business as Timber Point Healthcare Center, located in Camp Point, Illinois. The corporation is headquartered in Skokie, Illinois and was incorporated in 1997.

30.    Defendant Somerset Place, LLC is a skilled nursing and intermediate care facility doing business as Somerset Place, located in Chicago, Illinois. The limited liability company is

headquartered in Evanston, Illinois and was incorporated in 1998 and was involuntarily dissolved in 2014.

31.     Defendants Extended Care Consulting, LLC and Extended Care Clinical, LLC are a healthcare consulting company headquartered in Evanston, Illinois. Extended Care services 19 health care facilities, including St. James Manor, throughout the Chicagoland area. Both limited liability companies are headquartered in Evanston, Illinois and were incorporated in 2008.

### Defendant Skilled Nursing and Immediate Care Facilities in Indiana

32.     Defendant Extended Care's website states it operates at least five care facilities in Indiana.  Defendant Major Hospital, an Indiana entity formed pursuant to IC 16-22-8-6, owns six care facilities in Indiana: 1) Munster Med Inn located in Munster, Indiana; 2) Dyer Nursing and Rehabilitation Center located in Dyer, Indiana; 3) Sebo's Nursing and Rehabilitation Center located in Hobart, Indiana; 4) Lincolnshire Health Center located in Merrillville, Indiana; 5) Spring Mill Health Campus located in Merrillville, Indiana; and 6) Lake County Nursing and Rehabilitation Center located in East Chicago, Indiana.

33.     Defendant Dyer Nursing and Rehabilitation Center, LLC either owns or operates the Dyer Nursing and Rehabilitation Center located in Dyer, Indiana.  The limited liability company is headquartered in Evanston, Illinois.

34.     Defendant Lincolnshire Health & Rehabilitation Center, LLC, an Indiana limited liability company, manages and operates Lincolnshire Health & Rehabilitation Center.  The limited liability company is headquartered in Evanston, Illinois.

35.     Defendant DLS Financial Consulting LLC, an Indiana limited liability company, manages and operates Dyer Nursing and Rehabilitation Center located in Dyer, Indiana, Sebo's Nursing and Rehabilitation Center located in Hobart, Indiana and Lake County Nursing and

Rehabilitation Center in East Chicago, Indiana. The limited liability company is headquartered in Evanston, Illinois.

36.     Both Defendants are managed by Central Street Management, LLC with their principle office located at 2201 West Main Street, Evanston, Illinois.

## III.    JURISDICTION AND VENUE

37.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 because the case arises under a federal statute, 31 U.S.C. §3729, *et seq.* There has been no public disclosure of the fraud alleged herein. Moreover, the relators are an original source because (1) prior to any public disclosure they voluntarily disclosed to the government the information on which the allegations in this suit are based; and (2) they have knowledge that is independent of, and materially adds to, any publicly disclosed information, and they voluntarily provided that information to the government before filing this suit.

38.     Venue is proper in this district under 28 U.S.C. §1391(b) and 31 U.S.C. §3732(a) because at least one of the Defendants conducts business in this judicial district and at least one of the claims giving rise to this Complaint occurred in this judicial district.

## IV.    THE FALSE CLAIMS ACT

39.     The federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* imposes liability on any person who: knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval (§ 3729(a)(1)(A)); knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (§ 3729(a)(1)(B)); or conspires to commit such violations (§ 3729(a)(1)(C)).

40.     The FCA defines the term "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity, and no proof of specific

intent to defraud is required. § 3729(b)(1). A "claim" includes any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. § 3729(b)(2). A false record or statement is "material" if it has a natural tendency to influence, or is capable of influencing, the payment or receipt of money or property. § 3729(b)(4).

41.     Claims for payment knowingly submitted to Medicare that fail to meet the Medicare conditions of payment as set forth in the applicable statutes, regulations, and requirements constitute false and fraudulent claims under the FCA, creating liability for those who submitted the false claims, created the false statements or records, and/or caused or conspired in the false claims or false statements.

## V.     MEDICARE PART A: SKILLED NURSING FACILITY BENEFIT

### A.     Medicare Coverage of SNF Rehabilitation Therapy

42.     Congress established the Medicare Program to provide health insurance coverage for individuals aged 65 or older and for individuals with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

43.     The Medicare Program is divided into four parts, each covering different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

44.     Subject to certain conditions, Medicare Part A covers up to 100 days of nursing and/or rehabilitative care in a skilled nursing facility ("SNF") for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. §1395d(a)(2)(A); 42 C.F.R. §409.61(b).

11

45.     Among the conditions that Medicare imposes on its Part A SNF benefit are that:
(1) the patient requires skilled nursing care or skilled rehabilitation services, or both, on a daily
basis; (2) the daily skilled services must be services that, as a practical matter, can only be
provided in a SNF on an inpatient basis; and (3) the services are provided to address a condition
for which the patient received treatment during a qualifying hospital stay or that arose while the
patient was receiving care in a skilled nursing facility for a condition treated during the hospital
stay. 42 U.S.C. §1395f(a)(2)(B); 42 C.F.R. §409.31(b).

46.     Upon admission, or as soon as reasonably practicable, Medicare requires that a
physician or certain other qualified health care practitioners certify that these conditions are met
at the time of a patient's admission to the SNF and re-certify the patient's continuing need for
skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. §
1395f(a)(2)(B); Medicare Benefit Policy Manual, Ch. 8, §§40, 40.1.

47.     For a therapy service to be considered skilled, it must be "so inherently complex
that it can be safely and effectively performed only by, or under the supervision of, professional
or technical personnel," 42 C.F.R § 409.32(a), such as physical therapists, occupational
therapists, or speech pathologists. *See* 42. C.F.R. § 409.31(a).

48.     Personal care services are not skilled services covered under Medicare Part A. An
example of a personal care service that is not covered is the "general supervision of exercises
which have been taught to the patient, including, but not limited to, the actual carrying out of
maintenance programs (*i.e.*, the performance of repetitive exercises required to maintain function
do not require the skills of a therapist and would not constitute skilled rehabilitation services).
Similarly, repetitious exercises to improve gait, maintain strength, or endurance; passive
exercises to maintain range of motion in paralyzed extremities, which are not related to a specific

12

loss of function; and assistive walking do not constitute skilled rehabilitation services." 42

C.F.R. § 409.33(d). Indeed, many skilled nursing facility inpatients do not require skilled

physical therapy services but do require services which are more routine in nature and can be

performed by supportive personnel. *See* Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

49.     Medicare Part A covers only those services that are "reasonable and necessary for

the diagnosis or treatment of illness of injury." *See* 42 U.S.C. §1395y(a)(1)(A) ("[N]o payment

may be made under part A or part B for any expenses incurred for items or

services…which…are not reasonable and necessary for the diagnosis or treatment of illness or

injury or to improve the functioning of a malformed body member").

50.     In the context of skilled nursing or rehabilitation therapy, services are considered

reasonable and necessary if the services are consistent with the nature and severity of the

patient's individual illness, injury, or particular medical needs; consistent with accepted

standards of medical practice; and reasonable in terms of duration and quantity. *See* Medicare

Benefit Policy Manual, Ch. 8, §30.

51.     In order to assess the reasonableness and necessity of skilled rehabilitation

therapy services, and thereby determine whether reimbursement is appropriate, Medicare rules

require proper and complete documentation of the services rendered to beneficiaries. In

particular, the Medicare statute provides that "no such payments shall be made to any provider

unless it has furnished such information as the Secretary may request in order to determine the

amounts due to such provider under this part for the period with respect t to which the amounts

are being paid or any prior period." *See* 42 U.S.C. § 1395g(a); Medicare Benefit Policy Manual,

Ch. 8, §30.2.2.1.

**B.      Medicare Payments to Skilled Nursing Facilities for Rehabilitation Therapy**

52.      Payment under Medicare for skilled nursing facility services is relatively straightforward. Under its prospective payment system ("PPS"), Medicare pays the SNF a pre-determined daily rate for each day skilled nursing and rehabilitation services are provided to the patient. These rates are adjusted annually and based on locality. *See* 42 C.F.R. §412; 42 U.S.C. §1395yy.

53.      The daily rate is based, in part, on the patient's anticipated need for skilled nursing care and therapy. Specifically, the daily PPS rate that Medicare pays an SNF depends on the Resource Utilization Group ("RUG") to which a patient is assigned, and each RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

54.      There are five RUG levels for rehabilitation therapy patients: Rehabilitation Ultra High (know as "RU"); Rehabilitation Very High ("RV"); Rehabilitation High ("RH"); Rehabilitation Medium ("RM"); and Rehabilitation Low ("RL").

55.      The RUG level to which a patient is assigned depends on the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment reference period (also known as the "look back period") (more on this below). The requirements for the five RUG levels are as follows:

| RUG Level | Requirements |
|---|---|
| Ultra High (RU) | • 720 minutes/week total therapy<br>• At least 2 disciplines, one at least 5 days/week |
| Very High (RV) | • 500 minutes/week total therapy<br>• At least 1 discipline, 5 days/week |
| High (RH) | • 325 minutes/week total therapy<br>• At least 1 discipline, 5 days/week |

14

| Medium (RM) | • 150 minutes/week total therapy<br>• 5 days/week across 3 disciplines |
| Low (RL) | • 45 minutes/week total therapy<br>• 3 days/week across 3 disciplines |

*See* 63 Fed. Reg. at 26,262.

56.     Medicare pays the highest rate for individuals receiving therapy at the Ultra High

(RU) level. This category is "intended to apply only to the most complex cases requiring

rehabilitative therapy well above the average amount of service time." *Id.* at 26,258.

Furthermore, the required therapy minutes for each RUG level are to be seen as bare minimums

for reimbursement for that particular RUG level.

57.     Medicare reimbursement also varies within each RUG level depending on: (1) the

patient's ability to perform certain activities of daily living ("ADLs"), such as eating, using the

toilet, bed mobility, and transfers (*e.g.*, from a bed to a chair); and (2) whether, and to what

extent, the patient requires extensive services, such as intravenous treatment, a ventilator,

tracheostomy, or suctioning.

58.     Patients are assigned one of five possible ADL (activities of daily living) scores:

A, B, C, L, or X. Patients with an "A" score are able to perform daily living activities without

assistance; patients with a "B" score require assistance with some activities but do not require

any extensive services; patients with a "C" score require assistance with all daily living activities

but do not require any extensive services; patients with an ADL score of "L" require only one

extensive service; and patients who require several extensive services typically receive an ADL

score of "X."

59.     The table below shows the rates per day (for fiscal year 2017) at which Medicare

pays skilled nursing facilities for patients receiving nursing and rehabilitation services based on

the patient's RUG level. The rates include both nursing and therapy components. The range for each RUG level reflects reimbursement based on a patient's ADL score (the lowest reflecting patients with an ADL score of "A" and the highest reimbursement amount reflecting patients with an ADL score of "X").

| Medicare Reimbursement: Daily Rates Based on RUG Level for Fiscal Year 2017 | |
|---|---|
| Ultra High (RU) | $804.36-$509.89 |
| Very High (RV) | $715.94-$451.27 |
| High (RH) | $648.65-$361.19 |
| Medium (RM) | $595.02-$309.32 |
| Low (RL) | $522.56-$250.88 |

*See* 81 Fed. Reg. 51976-51977.

### C.     Medicare Claims for Payment of SNF Rehabilitation Therapy

60.     Medicare requires SNFs to periodically assess each patient's clinical condition and functional status, as well as the patient's actual and expected need for skilled services. SNFs are required to report the results of these assessment using a standardized tool known as the Minimum Data Set ("MDS"). In short, MDS assessments are completed for each patient on admission to the facility and at various mandated intervals thereafter, and then this information is transmitted electronically by the facility to the MDS database of their respective state. MDS information from state databases is then sent to the national MDS database.

61.     More important, the MDS is used as the basis for determining a patient's RUG level, and, therefore, the daily rate that Medicare will pay the SNF to provide skilled nursing or therapy to that patient.

16

62.     Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265.

63.     The MDS form requires a certification by the provider stating, in part, that: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." *See* MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening.

64.     As referenced above, SNFs assess patients and complete the MDS form for each particular patient upon admission, and then upon the 5th, 14th, 30th, 60th, and 90th day of the patient's stay at the facility. The date the assessment is completed is known as the Assessment Reference Date ("ARD"). The ARD is defined as the specific end point of look-back periods in the MDS assessment process. It allows for those whom complete the MDS to refer to the same period of time when reporting the condition of the resident. For SNFs, the ARD look back period is 7-days, meaning that when a skilled nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. 63 Fed. Reg. 26,265-26,268.

65.     The table below shows the Medicare assessment and payment schedule for SNFs:

| RUG Assessment Date (ARD) | ARD Window (including grace days) | Medicare Payment Days Determined by RUG |
|---|---|---|
| 5th   Day | Days 1-8 | Days 1-14 |
| 14th Day | Days 11-19 | Days 15-30 |
| 30th Day | Days 21-34 | Days 31-60 |
| 60th Day | Days 50-64 | Days 61-90 |
| 90th Day | Days 80-94 | Days 91-100 |

66.     The "Special Treatment and Procedures" section of the MDS requires a SNF to report the number of minutes of skilled rehabilitation therapy the facility provided to a patient during the look-back period as well as the types of therapy provided. In particular, a SNF must report the number of days and minutes of therapy the SNF provided to a patient in each of the following skilled rehabilitation therapy disciplines: physical therapy, occupational therapy, and speech-language pathology. This information directly impacts the RUG level assigned to each patient and therefore the amount of reimbursement that the SNF will receive for that patient.

67.     Medicare reimbursement payments are made according to the most recent assessment. For example, if a patient's second assessment after admission, reported on the 14th day of treatment, shows a RUG assignment of Ultra High, this indicates that from day 7 through day 14 of that patient's stay at the facility, the patient received 720 minutes of therapy in at least 2 disciplines, where at least one therapy occurred 5 days per week (see tables above). It would also mean that the SNF treating that patient would be paid for that patient at the Ultra High level for days 15 through 30 (the next ARD after day 14), unless Medicare was notified of a change of therapy plan (see below). *See* 63 Fed. Reg. 26267-26268. Similarly, if a patient's third assessment after admission, reported on the 30th day of treatment, shows a RUG assignment of High, this indicates that from day 23 through day 30, that patient received 500 minutes of therapy in at least one discipline, where at least one therapy (or the therapy provided if only in one discipline) occurred 5 days per week. It would also mean that the SNF treating the patient would be paid for that patient at the High level for days 31 through 60, unless Medicare was notified of a change in therapy plan.

68.     Effective October 1, 2011, Medicare requires that SNFs report a so-called Change of Therapy ("COT") if, after an assessment for a particular patient, "the intensity of therapy (that

is, the total reimbursable therapy minutes…) changes to such a degree that it…no longer reflects the RUG classification and payment assigned" for that patient. 76 Fed. Reg. at 48,518. Specifically, at the end of each -7-day period after an assessment, if the therapy delivered during that period does not match the last reported RUG, then the SNF must report the actual level of therapy being delivered in a COT, and the reimbursement for that patient's care will be adjusted accordingly. *See id.* at 48,518-26.

69.    A patient's RUG information is incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment owed to the skilled nursing facility. The HIPPS code must be included on the CMS-1450, which SNFs submit electronically to Medicare for payment. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. See Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

70.    SNFs submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors known as Medicare Administrative Contractors ("MACs"). MACs process and pay Medicare Part A claims for skilled nursing and rehabilitation therapy services performed in skilled nursing facilities.

71.    Of course, the above-described reimbursement structure requires that SNFs accurately and truthfully report RUG and ADL levels, as well as whether continued stay at the SNF is required.

## VI.    DEFENDANTS' CORPORATE STRUCTURE

72.    Defendants are a group of LLCs and corporations that own, manage or provide services related to skilled nursing and immediate care facilities in Illinois and Indiana. According to the cost reports[1] filed with the Illinois Department Healthcare and Family Services ("IDHFS"), Defendants Extended Care Consulting, as well as the various care facilities listed above, are owned by Eric Rothner and/or various of his family members either as individuals or through entities such as corporations, LLCs or trusts.

### A.    Extended Care controls and manages rehabilitation services and operations at the facility level in Illinois

73.    In addition to his ownership interest in the care facilities, Eric Rothner also has an ownership interest in Extended Care Consulting and Extended Care Clinical, Illinois limited liability companies.  Out of the 19 facilities in Illinois, 15 share the same principal address as Extended Care at 2201 West Main Street in Evanston, Illinois.

74.    Extended Care is managed by David Aronin and Central Street Management. State records list Mr. Aronin and Steven Miretzky as the managers for Central Street Management.

75.    Extended Care provides services, such as administration, maintenance, and housekeeping, to 19 rehabilitation and nursing facilities throughout the Chicagoland area owned directly or indirectly by Eric Rothner.

76.    Each of the 19 facilities that Extended Care provides services to, operates under its own corporation; however, according to state records, all of these corporate entities are

---

[1] Licensed skilled nursing and intermediate care facilities in Illinois are required to file an annual cost report.  210 ILCS 45/3-208.  Licensees are also required to disclose ownership information such as the name of the every owner, partner or shareholder.  *Id.* at 45/3-207.  The cost report instruction also requires care facilities owners to disclose ownership in related organizations that have any responsibility in operating the care facilities.  *See* IDHFS Instructions for Completing 2017 Long-Term Care Facilities Cost Reports at 23.

managed by the same managers/owners of Extended Care – Mr. Aronin, Mr. Miretzky, Eric

Rothner, and/or Central Street Management. Mr. Aronin is the registered agent for all 19

facilities of the corporation.

77.     In addition to being listed as the LLC manager for the care facilities, Mr. Aronin

and Mr. Miretzky are also listed on the www.medicare.gov website as the director or the

managing employee for 12 of the 19 Illinois facilities.

78.     In short, Extended Care and the 19 care facilities located in Illinois share common

ownership and management.

79.     As just one example of this operational hierarchy, state records show that St.

James Wellness Rehab & Villa and Extended Care are owned by the Rothner family and

managed by Central Street Management. Mr. Aronin is an LLC manager of Extended Care and

Mr. Miretzky is a LLC manager of St. James Wellness Rehab & Villa. Finally, according to

www.medicare.gov, both Mr. Aronin and Mr. Miretzky are directors of the St. James Wellness

Rehab & Villa.

> **B.     DLS Financial Consulting, LLC, Lincolnshire Health & Rehabilitation
> Center, LLC and Dyer Nursing and Rehabilitation Center, LLC control and
> manage rehabilitation services and operations at the facility level in Indiana**

80.     According to its website, Extended Care Consulting operates five care facilities in

Indiana: 1) Munster Med Inn, 2) Dyer Nursing and Rehabilitation Center, 3) Sebo's Nursing and

Rehabilitation Center, 4) Lincolnshire Health Care Center, and 5) Spring Mill Health Campus.

Additionally, according to the cost reports filed with IDHFS, Eric Rothner possesses an

ownership interest in Lake County Nursing and Rehabilitation Center, which was not listed on

the Extended Care Consulting website.

81.     The six care facilities in Indiana are owned by Major Hospital but operated by DLS Financial Consulting, LLC, Lincolnshire Health and Rehabilitation Center, LLC, or Dyer Nursing and Rehabilitation Center, LLC. Similar to the Illinois-based facilities, the Indiana facilities share common ownership and management.

82.     DLS Financial Consulting, LLC operates at least three care facilities in Indiana: Dyer Nursing and Rehabilitation Center, Sebo's Nursing and Rehabilitation Center, and Lake County Nursing and Rehabilitation Center. DLS Financial Consulting shares the same Evanston, Illinois principal address as Extended Care Consulting, and Miretzky is listed as the LLC manager.

83.     Lincolnshire Health & Rehabilitation Center, LLC operates a facility by the same name, and is managed by Mr. Miretzky, with its principal address listed as the same Evanston, Illinois address as Extended Care Consulting.

84.     Dyer Nursing and Rehabilitation Center, LLC either owns or operates a facility by the same name and is managed by Mr. Miretzky with its principal address listed as the same Evanston, Illinois address as Extended Care Consulting.

85.     According to www.medicare.org, Mr. Aronin is the managing employee for Dyer Nursing and Rehabilitation Center, Sebo's Nursing and Rehabilitation Center, and for Lake County Nursing and Rehabilitation Center.

86.     The administrative departments at each facility typically include admissions, social service, dietary, house keeping, and billing.

87.     The therapy staff at each facility typically includes physical therapists, physical therapy assistants, occupational therapists, certified occupational therapy assistants, and speech-language pathologists.

88.     At St. James Wellness Rehab & Villa, Rhonda Barajas, the MDS nurse, is responsible for collecting the information needed for the MDS. She also determines the ARD and submits the claims for payment.

## VII.    DEFENDANTS' FRAUDULENT CONDUCT

89.     Since at least 2016, Defendants, through their owners, directors and/or managers, systematically pressured facility administrators and therapists to classify Medicare Part A patients at the Ultra High RUG level and to extend their length of stay without regard for the patients' actual therapeutic or rehabilitative needs.

90.     Wendy Janulis is the Regional Vice President of Operations for Extended Care, LLC and has been in that position since November 2015.

91.     Prior to her promotion to Regional VP of Operations, she served as the administrator at Defendant Lemont Nursing and Rehabilitation Center for approximately nine years. As the administrator of the facility, she was responsible for developing reimbursement strategies resulting in high RUG scoring. The strategies she developed enabled the facility to increase the number of days it was able to bill Medicare at Ultra High RUG rates.

92.     In fact, during her time at Lemont Nursing and Rehabilitation Center, the percentage of rehabilitation days billed at Ultra High rate were significantly higher than both the national and state averages. The chart below shows percentage of total number of days Medicare beneficiaries classified at the Ultra High RUG level to the total number of days all Medicare beneficiaries residing at Lemont Nursing and Rehabilitation Center for 2013-2015.

|                          | 2013  | 2014  | 2015  |
|--------------------------|-------|-------|-------|
| Lemont Nursing & Rehab   | 72.7% | 74.8% | 74.6% |
| Illinois SNF Average     | 59.6% | 64.5% | 68.6% |
| National SNF Average     | 61.9% | 65.2% | 66.8% |

93.     When Ms. Janulis became the Regional VP of Operations for Extended Care, LLC, she directed the administrators of the facilities she oversaw to also implement reimbursement strategies that resulted in high RUG scoring and longer stays, regardless of patients' needs.

94.     Ms. Janulis frequently attends management meetings at St. James Wellness Rehab & Villa and give the managers of the facility directives, including demands to delay discharge of Medicare patients and increase the Medicare billings. In one specific incident, Relator Glasper informed Ms. Janulis that there were a couple patients ready to be discharged because they were at their prior level of functioning and that the discharge dates for these patients had already be pushed out once before. Relator Glasper also informed Ms. Janulis that they were being discharged to an assisted living home and there would be a staff to care for them. Ms. Janulis did not care and delayed the discharges stating that therapy is not complete until after a home evaluation has been done. Home evaluations can extend the stay between two to four weeks.

95.     Another strategy Ms. Janulis utilizes is adjusting the patients' ADL scores. As explained above, Medicare reimbursements varies depending on the patient's ability to perform daily living activities ("ADLs") – the more assistance a patient requires, the higher the reimbursement rate. Relator Glasper witnessed Ms. Janulis threaten facility personnel with their jobs if ADL scores did not increase at the next report period. One patient went from an ADL score of 0 (independent) to a score of 4 (total dependence) in one week.

96.     The pressure to meet these targets caused facility therapists to provide therapy that was not reasonable or necessary, skilled, and/or properly covered by the Medicare Part A benefit.

97. As a direct result of these practices, Defendants submitted false statements and false claims to Medicare and received millions of dollars in reimbursement to which they were not entitled.

**A. Fraudulent Classification and Billing of Patients at the Ultra High RUG Level**

98. Defendants employed various schemes to classify and bill as many patients as possible at the Ultra High RUG level, including setting the Ultra High RUG level as the default RUG level for all newly-admitted patients, and enrolling patients in as many therapy services and/or modalities as possible, regardless of whether it was clinically indicated.

99. According to the relators, once a Medicare Part A beneficiary is admitted to this facility, facility administrators and therapists are expected to enroll the patient in as many therapy services as possible at the time of admission and thereafter regardless of the patient's rehabilitative needs. These directives are expressed at daily and weekly staff meetings.

100. For example, Patient A was a 72-year-old female admitted to the St. James Manor facility in June 2017 following a hospital admission for a left hip replacement. While such a procedure would normally require only physical and occupational therapy, during Patient A's stay at the facility she was provided with physical, occupational, and speech therapy in an amount that allowed Defendants to classify and bill her at the Ultra High RUG level for the duration of her stay at St. James Manor. Not surprisingly, there was nothing in Patient A's therapy notes to indicate why a 72-year old woman who was attempting to recover from a successful hip replacement operation required speech therapy – a therapy service usually reserved for patients who have suffered from a stroke (more on Patient A below).

101. Other patients received multiple therapy services when it was clear that they would not benefit from rehabilitative therapy and the services provided by the therapists did not

require special skills or training. For example, Patient B, an 87-year-old female, was admitted to St. James Manor in June 2017. The therapy progress notes repeatedly indicate that Patient B was consistently fatigued, was demonstrating decreasing cognitive abilities that impacted her ability to complete simple tasks and exercises, including the ability to get out of bed. Patient B planned to be discharged to a home where a caregiver would be present and home health services would be provided. Yet, Defendants billed Medicare at the Ultra High RUG level for the full 100 days for services could be carried out by family members and caregivers such as providing verbal cues for dressing and for hand placement to maintain balance when sitting.

102.    Similarly, Patient C, a 73-year-old female, began receiving physical and occupational therapy services from St. James Manor at the end of February 2017 after a 12-day hospital stay for treatment for an UTI and gangrene. From the onset, it was clear that Patient C was not a suitable candidate for either of these therapy services. This was a fact that Defendants were acutely aware since prior to Patient C's hospital stay, she was already a long-term resident of the facility and was receiving continuous non-skilled nursing care. This was because Patient C was suffering from dementia and had difficulty understanding and following even single step commands (facts that were well indicated in Patient C's progress notes).  However, rather than place Patient C back in long-term non-skilled care upon her return to the facility, Defendants took advantage of SNF billing regulations and profited from Patient C's hospital stay by billing Medicare for 100 full days of physical and occupational therapy at the Very High RUG level.

103.    Of course, Patient C showed no progress during this time, and as soon as the 100 days of Medicare reimbursement were up she was discharged back to the facility as a long-term care resident requiring 24-hour non-skilled assistance.

104.    Patient D, a 73-year-old-man, was initially admitted to St. James Manor following hospital treatment for a urinary tract infection and heart failure. From the time of his admission, it was clear that Patient D was not a good candidate for skilled therapy as his serious medical condition precluded him from participating in any therapy exercises. Nevertheless, Patient D received an initial RUG level classification of Ultra High. Indeed, two days after his initial admission, Patient D was hospitalized for 18 days for kidney failure and for an altered mental state.

105.    After his 18-day hospitalization, Patient D was re-admitted to St. James Manor and re-evaluated. More important, his therapy notes indicate that due to "impaired hearing" and an impaired ability to communicate, as well as an inability to safely "complete ADLs," Patient D was not a good candidate for skilled therapy. Nevertheless, Defendants billed Medicare for Patient D at the Ultra High RUG level for 26 days, and only stopped doing so because Patient D's medical condition was so bad that he needed to hospitalized for a third time.

106.    Defendants did not tolerate SNF administrator and/or therapist resistance to setting the RUG level of new admissions at Ultra High by default, nor to the types and/or amount of therapy provided to patients. If administrators or therapists resisted theses instructions, their hours would be reduced, and it would be made clear to them that their job was in jeopardy. Defendants used these same tactics to pressure administrators to increase ADL scores. Defendants followed through on these threats: Relator Glasper's hours was reduced shortly after she complained to Defendants that patients were receiving and being billed for therapy that they did not need and/or could not benefit from, or simply were not receiving at all.

107.    Instead, Defendants instructed all SNF administrators and therapists to do whatever it took to achieve corporate goals for RUG billing. This included providing and/or

27

billing therapy to patients even if they did not want it and/or think they would benefit from it (or, as described above, could not take part in the therapy itself because of their medical condition). It also included having therapists in one discipline cover for a therapist in another discipline if the initial therapist had not provided enough therapy minutes to bill the patient at the Ultra High RUG level even if the patient would not benefit from the second form of therapy.

108.    Not surprisingly, as a result of the actions described above, Defendants' Ultra High billings not only rose significantly over time but were higher when compared to state and national billing averages. For example, the table below shows the percentage of rehabilitation days that Defendants billed Medicare at the Ultra High RUG level for the years 2012 and 2013 at just four of Defendants' Illinois SNFs:

| SNF Facility | Ultra High RUG 2013 | Ultra High RUG 2012 |
|---|---|---|
| Lemont Nursing & Rehab | 71% | 57% |
| Sheridan Shores Nursing & Rehab | 71% | 64% |
| Tri-State Nursing & Rehab | 70% | 73% |
| Lakewood Nursing & Rehab | 68% | 50% |

109.    The national Ultra High RUG level averages for all skilled nursing facilities in 2012 and 2013 were 50% and 54% respectively. As such, for fiscal year 2013, each of the Defendant Illinois SNFs listed above billed Medicare at the Ultra High RUG level for at least 14% more rehabilitation days than the national average (and as much as 17% above the average). The numbers above also demonstrate dramatic increases in Ultra High RUG level billing even over a short period of time. For example, Ultra High billing increased at the Lemont Nursing &

Rehabilitation facility by 14% from 2012 to 2013. Similarly, Ultra High billing increased at the Lakewood Nursing & Rehabilitation facility by 18% for that same single year time period.

**B. Defendants Keep Patients in Their SNFs Longer Than Reasonable or Necessary to Increase Medicare Reimbursement**

110.     Defendants also employed various schemes to needlessly increase the length of stay for all SNF patients.

111.     "Length of stay" refers to the number of days that a Medicare beneficiary stays at a SNF receiving skilled nursing or therapy services. As indicated above, subject to certain conditions, Medicare Part A covers up to 100 days of nursing and/or rehabilitative care in a skilled nursing facility for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. §1395d(a)(2)(A); 42 C.F.R. §409.61(b).

112.     The average length of stay for all SNFs in Illinois from 2013 to 2015 were 30.6, 30.3, and 29.7 days respectively. While the average length of stay remained relatively constant throughout the state during this period, the length of stay at Defendant Illinois SNFs rose. In 2013, the average length of stay at Defendant Illinois SNFs was 9.17% greater than the state average; that percentage rose to 15.17% in 2014. And by 2015, the average length of stay at Defendant Illinois SNFs was 19.42% greater than the state average.

113.     This trend holds true to Defendant Indiana SNFs as well. In 2013 and 2014, the average length of stay for Defendant Indiana SNFs were one to two percentage point lower than the state average. In 2015, however, all six of Defendant Indiana SNFs have longer length of stays compared to the state average. In fact, average length of stay for Defendant Indiana SNFs was 7.28% greater than the average length of stay for all SNFs in Indiana in 2015.

114.     Also telling, is the increased number of Defendant Illinois SNFs that fall within the first quartile of average length of stay. These facilities are in the top 25% of longest average

length of stay in Illinois. The graph below illustrates this trend: In 2013, three of the Defendant

Illinois SNFs had an average length of stay that fell in the top 25%. In 2014, that number rose to

six and by 2015, nine of Defendants' 15 SNFs were keeping their patients longer than at least

three-quarters of all SNFs in Illinois.



     115.    Defendants pressured their facility administrators and therapists to extend the

stays of their Medicare patients whenever possible to the full 100 days eligible for

reimbursement regardless of actual patient rehabilitative needs.

     116.    Indeed, even when patients and/or their family members pleaded with SNF staff

to be able to return to their own homes and families, their pleas were ignored for the sole purpose

of maximizing Medicare reimbursements. This included Defendants instructing SNF

administrators and therapists to take advantage of the emotional vulnerability of the families or

other caregivers of their patients by telling them that if they really cared for the well-being of their loved one they would convince them to stay at the facility and continue to engage in therapy (or words to this effect).

117. Patient H was admitted to St. James Manor & Villas on February 27, 2017 following a joint replacement surgery. She responded well to the therapy and scheduled to be discharged on March 18, 2017. Four days prior to the scheduled discharged, Defendants determined that she would not be discharged despite her doctor's order and convinced her and her partner that she needed more therapy. She remained in the facility for an additional two and half weeks.

118. Another scheme employed by Defendants to extend the length of stay of their patients was to require facility administrators to schedule home evaluations before discharging Medicare beneficiaries who had yet to exhaust their SNF benefit even when the beneficiary was being discharged to a long-term care facility or into the care of their family or had a medical condition that did not require a home evaluation. As such, when a patient was medically ready for discharge, or indicated that they wanted to and/or were able to go home, they would be informed that they could not be discharged until such time as a home evaluation was conducted. Defendants would then delay these home evaluations, allowing Defendants to continue to bill Medicare for therapy or rehabilitative services that were not medically necessary.

119. Home evaluations are not required by Medicare prior to discharge. SNFs are required to provide their patients with a comprehensive discharge plan that takes into consideration the patient's needs and goals of care and treatment preferences and the caregiver/ support person's availability and capacity, and should involve the patient and patient's representative in developing the discharge plan. *See* 42 CFR 483.21(c).

120.     For example, Patient E was admitted at the facility on May 4, 2017. She was independent with ADLs and her family wanted to take home on June 6. 2017. The therapy had indicated that she was ready to be discharged; she had met all her goals. Ms. Janulis was more concern with billing than patient care and told the therapists that she wanted them to continue to treat Patient E. Patient E's discharged was delayed for approximately three weeks under the pretense of requiring a home assessment.

121.     Similarly, Defendants also increased length of stay by pressuring their SNF to constantly increase patient therapy goals regardless of whether or not the therapy goals were necessary or even medically attainable based on the patient's medical condition.

122.     Take for example Patient A, the 72-year-old female patient discussed above who was admitted to the St. James Manor facility in June 2017 after a left hip replacement and was provided with 100 days of physical, occupational, and speech therapy. While her therapy progress notes indicate that she showed considerable progress even after a short period of therapy, and that she was a likely candidate for meeting all of her therapy goals early, rather than discharging her early, Defendants instructed her therapists to continue to increase her therapy goals beyond what those same therapists deemed necessary solely for the purpose of keeping her at St. James for the full 100 days that Defendants could bill Medicare for her therapy.

123.     As such, Patient A's therapy goal for standing upright was increased to 20 minutes without a rest break, even though she was to be discharged to her home where the distance from one room to another never would require her to stand for this length of time without a break. Another therapy goal that was unnecessarily upgraded was self-care toileting tasks. By Patient A's first progress evaluation, her therapy notes indicate that she was safely performing all toileting tasks without any assistive device, and that there was no further progress

to be made in this area since standby assistance would be present in the patient's home if needed. Despite this assessment, and despite the fact that Patient A was to be discharged to a home with a care giver and regular home services, her therapy goal was unnecessarily upgraded to independence in all toileting areas.

124.    Patient F, a 71-year-old female, was admitted to St. James Manor in March 2017 after a hip replacement. Like Patient A, her therapy notes indicate that she responded very well to physical and occupational therapy, and that she recovered to her prior level of functionality quickly (within a week). Rather than discharging her, Defendants constantly upgraded her therapy goals to keep her at the facility to maximize the Medicare reimbursement. This included increasing her dressing goal (the ability of the patient to dress themselves) despite the fact that Patient F not only demonstrated the ability to do so but was to be discharged to her own home where her spouse and adult children could provide any assistance if necessary.

125.    Even worse, based on her quick recovery, Patient F and her family repeatedly requested that she be released from St. James to no avail. Not only were their pleas rebuffed, but in an effort to convince her to stay at the facility, Defendants falsely threatened Patient E that if she left the facility, Medicare would not cover her therapy sessions and that she would be responsible for paying for her own treatment.

126.    Patient G, an 84-year-old male, was admitted to St. James Manor in June 2017 for physical and occupational therapy due to muscle weakness and unsteadiness on his feet. Daily therapy progress notes for Patient G show that within two to three days after admission he was able to stand for 25 minutes on his own before requiring break, bike for 20 minutes, and complete all functional transfers without physical assistance. Indeed, after less than a week, Patient F was healthy enough to leave the facility everyday with his family to tend to his garden.

127.     Nevertheless, rather than discharging a clearly fully recovered patient,
Defendants increased his therapy goals and required that Patient G go through a daily exercise
routine that did not require a skilled therapist (as is required by Medicare), and billed Medicare
at the Ultra High RUG level for thirty days after Patient G had made a full recovery.

### LEGAL CLAIMS

### Count I
### Federal False Claims Act: Presentation of False Claims
### 31 U.S.C. §3729(a)(1)

128.     Relators re-allege and incorporate by reference the allegations previously alleged
herein.

129.     This is a claim for treble damages and civil penalties under the False Claims Act,
31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C).

130.     As a result of the misconduct alleged herein, Defendants knowingly presented, or
caused to be presented, to the United States government a false or fraudulent claim for payment
or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

131.     As a result of the misconduct alleged herein, Defendants knowingly made, used,
or caused to be made or used, a false record or statement material to a false or fraudulent claim in
violation of 31 U.S.C. § 3729(a)(1)(B).

132.     As a result of the misconduct alleged herein, Defendants knowingly conspired to
present, or cause to be presented, a false or fraudulent claim for payment or approval to the
United States government, and knowingly conspired to make, use, or caused to be made or used,
a false record or statement material to false or fraudulent claims in violation of 31 U.S.C. §
3729(a)(1)(C).

133.    At the times Defendants presented or cause to be presented the false or fraudulent claims for payment or approval, they knew that the claims were false or fraudulent or they acted in deliberate ignorance or reckless disregard thereof.

134.    The United States government, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have been paid.

135.    By reason of these payments, the United States government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**COUNT II**
**False Claims Act: Making or Using False Record or Statement**
**31 U.S.C. § 3729(a)(2)**

136.    Relators re-allege and incorporate by reference the allegations previously alleged herein.

137.    Defendants have knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government Insurers.

138.    At the times Defendants made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the Government Insurers, they knew that the information in them was false or acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

**COUNT III**
**False Claims Act: False Record to Avoid Obligation to Refund**
**31 U.S.C. § 3729(a)(2)**

139.    Relators re-allege and incorporate by reference the allegations previously alleged herein.

140.     Defendants have knowingly made, used or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government Insurers.

141.     At the times Defendants made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government Insurers, they knew that the information in them was false or they acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

### Count IV
### False Claims Act: Retaliation
### 31 U.S.C. §3730(h)

142.     Relators re-allege and incorporate by reference the allegations previously alleged herein.

143.     Because of their lawful acts to stop Defendants from defrauding the government as alleged herein, Defendants retaliated against Relators in the terms and conditions of their employment by actually (Relator Wyckoff) and constructively (Relator Glasper) firing them.

144.     Under 31 U.S.C. § 3730(h), Defendants are liable to the Relators for two (2) times their back pay plus interest and special damages, including but not limited to attorneys' fees and litigation costs.

### PRAYER FOR RELIEF

WHEREFORE, Relators Jori Glasper and Krystal Wyckoff respectfully request that the Court enter judgment in their favor and in favor of the United States of America against all Defendants.

36

Respectfully submitted,

_____
Cindy Tsai

Mike Kanovitz
Cindy Tsai
Loevy & Loevy
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
Phone: 312-243-5900
*Attorneys for Relators Jori Glasper and Krystal Wyckoff*