**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JORI GLASPER and KRYSTAL WYCKOFF, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 18-cv-6063 |
| v. | ) ) | Hon. Steven C. Seeger |
| ST. JAMES WELLNESS REHAB & VILLAS, LLC, | ) ) ) | |
| Defendant. | ) ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Jori Glasper and Krystal Wyckoff worked at St. James Wellness Rehab & Villas, a nursing and care facility. Glasper and Wyckoff allege that they observed a series of billing practices at St. James that defrauded Medicare. And they claim that St. James retaliated against them when they sounded the alarm.

The alleged fraud involved giving patients too much care for too long. Glasper and Wyckoff contend that St. James pressured its administrators and therapists to give unneeded therapy, and delay the discharge of patients who were ready to go home. St. James allegedly did so as part of a scheme to collect more reimbursements from Medicare. The greater the care, and the longer the stays, the more that St. James could extract from the federal government.

Glasper and Wyckoff ultimately sued St. James as relators under the False Claims Act for the alleged fraud. They also seek damages for retaliation. St. James, in turn, moved to dismiss.

For reasons explained below, the Court grants the motion to dismiss, but grants leave to amend.

## Background

At the motion to dismiss stage, the Court must accept the complaint's well-pleaded allegations as true. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Relators Jori Glasper and Krystal Wyckoff formerly worked at St. James, a "skilled nursing and intermediate care facility" in Crete, Illinois. *See* Am. Cplt., at ¶ 9 (Dckt. No. 36). Glasper was a social services director at St. James from 2015 to 2017. *Id.* at ¶ 5. She reviewed patients' therapy and progress notes, assessed treatment needs, prepared discharge papers, and coordinated and ordered all services and equipment needed by patients ready for discharge. *Id.* She was the point of contact for patients. *Id.*

Wyckoff was the therapy program director at St. James from March 2017 to November 2017. *Id.* at ¶ 7. During that time, she was employed by third party Paragon Rehabilitation, but she claims that her work was "performed for the benefit of and at the direction of St. James Manor." *Id.* As therapy program director at St. James, Wyckoff reviewed patients' progress notes for therapy, helped develop discharge plans for patients, and coordinated with all services at the facility to ensure patients' needs were met. *Id.* She developed knowledge of the "assessment, care, and billing practices" of St. James. *Id.*

Unpacking the claims requires an understanding of how Medicare makes payments to skilled nursing facilities for rehabilitation therapy. Basically, Medicare imposes caps for care. The amount that Medicare will pay depends on the length of the stay, and the needs of the patient.

2

Under its prospective payment system, Medicare pays facilities a predetermined rate for each day that they provide skilled nursing and rehabilitation services to a patient, for up to 100 days of treatment. *Id.* at ¶¶ 25, 65. The daily rate is based in part on the patient's need for nursing care and therapy. *Id.* at ¶ 26. Specifically, a patient is assigned a Resource Utilization Group ("RUG") that reflects the anticipated costs associated with providing nursing and rehabilitative care to patients with similar characteristics and needs. *Id.*

There are five RUG levels, ranging from "Rehabilitation Low" to "Rehabilitation Ultra High." *Id.* at ¶ 27. Where a patient falls in the range of RUG categories depends on factors like how much time the patient spends in therapy and the number of therapy disciplines that the patient receives in a week. *Id.* at ¶ 28. The higher a patient's RUG category, the more Medicare pays for that patient. *Id.* at ¶ 29.

The Medicare reimbursement within each RUG level also varies based on the patient's ability to perform certain daily activities (like eating, using the toilet, and moving around), and whether the patient requires extensive services like IV treatments, a ventilator, tracheostomy, or suctioning. *Id.* at ¶ 30. The more help a patient needs with daily living activities, the more Medicare pays the facility. *Id.* at ¶ 32.

According to Glasper and Wyckoff, from at least 2015 through November 2017, St. James pressured facility administrators and therapists to improperly classify certain Medicare patients as Rehabilitation Ultra High – the highest RUG level – and to extend patients' stays regardless of the patients' actual needs. *Id.* at ¶ 45. Relators also allege that St. James underreported patients' abilities to perform daily living activities to maximize the reimbursement amount within the Rehabilitation Ultra High RUG level. *Id.* at ¶ 49.

Relators mention one person by name, Wendy Janulis, the Regional Vice President of Operations for Extended Care, LLC. *Id.* at ¶ 46. As an aside, the complaint does not explain the exact relationship between Extended Care and St. James. Maybe St. James is a subsidiary, or maybe they are relatives in the same corporate family. Even so, the key point seems to be that Extended Care had managerial authority over St. James.

The complaint alleges that Janulis directed administrators at the "facilities she oversaw" – presumably including St. James – to "implement reimbursement strategies that resulted in high RUG scoring and longer stays, regardless of patients' needs." *Id.* at ¶ 47. She made that directive when she became the VP in November 2015. *Id.* at ¶¶ 46–48.

Janulis frequently attended management meetings at St. James. *Id.* at ¶ 48. She directed St. James managers to "delay discharge of Medicare patients and increase Medicare billings." *Id.*

The complaint offers an example, but does not identify the patients or the timing. Glasper informed Janulis that at least two patients were ready to be discharged and could receive appropriate care elsewhere. *Id.* But Janulis "delayed the discharges," explaining that therapy was not complete until a home evaluation was performed. *Id.*

The complaint offers one more example. At some point, Janulis allegedly "threaten[ed] facility personnel with their jobs if ADL [activities of daily living] scores did not increase at the next report period." *Id.* at ¶ 49. Sometime later, one patient's scores went up from 0 to 4 in "one week." *Id.*

The complaint does not reveal when Janulis made that threat, or who heard it. The complaint also does not provide the backstory about that patient, or why the score went up, or

when.  The complaint does not address whether the person who increased the score knew about the threat by Janulis.

Other paragraphs of the complaint offer examples of patients who received unneeded therapies, or were discharged later than necessary.  The complaint basically alleges that certain patients received too much care for too long.

For instance, Relators point to Patient A, a 72-year-old female admitted to St. James in June 2017 after a left hip replacement.  *Id.* at ¶ 54.  While recovery from a hip replacement usually entails only physical and occupational therapy, St. James provided Patient A with physical, occupational, and speech therapy in an amount that allowed it to classify her at the Ultra High RUG level.  *Id.*

Although Patient A was a good candidate for meeting her therapy goals early, St. James kept her for 100 days – the maximum number of days covered by Medicare.  *Id.* at ¶ 73. Moreover, St. James upgraded Patient A's therapy goals for standing upright and self-care toileting tasks during her stay, even though she would be discharged to a home where a caregiver could help with those tasks.  *Id.* at ¶ 74.

In another example, Relators allege that St. James wrongfully billed Medicare for Patient F, a 71-year-old female admitted to St. James in March 2017 after a hip replacement.  *Id.* at ¶ 75. Patient F's therapy notes indicated that she was responding well to therapy, yet St. James boosted her therapy goals to keep her longer.  *Id.*  St. James rebuffed pleas from Patient F's family to release her, threatening Patient F that Medicare would not cover her therapy sessions if she left the facility.  *Id.* at ¶ 76.

Relators offer several other examples along the same lines.  *Id.* at ¶¶ 55–59, 68, 71, 77– 78.  The punchline is that St. James had a practice of "falsely and fraudulently stat[ing] that St.

James Manor patients were sicker than they really were and required more and longer care than they actually did." *Id.* at ¶ 60. St. James therefore "submitted or caused to be submitted false statements and false claims to Medicare and received millions of dollars in reimbursement to which they were not entitled." *Id.* at ¶ 51.

Relators further say that St. James employees risked getting fired if they did not comply with the scheme. *Id.* at ¶ 62. Glasper claims that her "hours were reduced shortly after she complained that patients were receiving and being billed for therapy that they did not need and/or could not benefit from, or simply were not receiving at all." *Id.* She alleges that St. James required her "to continue to perform the same amount of work" after cutting her hours. *Id.* at ¶ 94.

Eventually, Glasper left St. James because her hours were cut. *Id.* at ¶ 95. She claims that she was constructively terminated. *Id.* at ¶ 96.

Like Glasper, Wyckoff alleges that she "complained to the administrators and supervisors at St. James Manor that St. James Manor was billing for patients whose conditions did not justify the therapy being provided." *Id.* at ¶ 99. And like Glasper, Wyckoff says that St. James retaliated against after she complained. She alleges that St. James ordered Paragon, her formal employer, to fire her. *Id.* at ¶ 101. In fact, Wyckoff contends that her direct supervisor at Paragon said that he didn't want to fire her – but did so on St. James's direction. *Id.* at ¶ 102.

Glasper and Wyckoff ultimately filed suit against St. James under the False Claims Act. The United States declined to intervene. *See* United States's Notice of Election to Decline Intervention (Dckt. No. 21). Relators later amended the complaint to drop 25 of 26 defendants,

leaving only St. James. *See* Am. Cplt. (Dckt. No. 36). Although they trimmed the defendants, Relators' factual allegations remained largely unchanged.[1]

The amended complaint includes five counts. *See* Am. Cplt., at ¶¶ 79–103 (Dckt. No. 36). Relators bring three counts under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, for making and filing false claims under Medicare (Counts I–III). *Id.* They allege that St. James engaged in four fraudulent schemes: (1) presumptively placing patients in the highest therapy reimbursement level possible; (2) scheduling and reporting that patients received therapy even after their treating therapists recommended discharge; (3) delaying discharge to bill for unneeded therapy; and (4) providing medically unnecessary therapies. *Id.* at ¶ 3.

Relators also bring two claims of retaliation under the False Claims Act, 31 U.S.C. § 3730(h). They allege that St. James cut Glasper's work hours (Count IV) and directed Paragon to terminate Wyckoff (Count V) because of their complaints about the facility's practices. *Id.* at ¶¶ 92–103.

St. James moved to dismiss the amended complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. *See* Def.'s Mtn. to Dismiss (Dckt. No. 47).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6)

---

[1] The original complaint included the same five claims against St. James. Relators initially combined both retaliation claims into a single count, Count IV. *See* Cplt., at ¶¶ 142–44 (Dckt. No. 1). However, the operative complaint separates Glasper and Wyckoff's retaliation claims into two counts (Count IV and Count V). *See* Am. Cplt., at ¶¶ 92–103 (Dckt. No. 36).

motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

The False Claims Act is an anti-fraud statute, so claims brought under 31 U.S.C. § 3729 must satisfy the heightened pleading requirements of Rule 9(b).  *See United States ex rel. Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 603 (7th Cir. 2005).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud."  *See* Fed. R. Civ. P. 9(b).  A plaintiff pleading fraud must allege the "who, what, when, where, and how" of the circumstances surrounding the fraud.  *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted); *see also United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009).

Retaliation claims under the False Claims Act are not subject to Rule 9(b)'s heightened pleading standard.  *See United States ex rel. Sibley v. Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 655 (7th Cir. 2022) ("[A] § 3730(h) claim need not be pleaded with particularity under Rule 9(b).").  Even so, a complaint must allege enough facts to tell a story that holds together.  *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

**Analysis**

"First enacted in 1863 to combat rampant fraud and price-gouging in Civil War defense contracts," the False Claims Act "creates a right of action under which private parties may, on behalf of the federal government, bring lawsuits alleging fraud."  *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 272 (7th Cir. 2016); *see also United States v. Molina Healthcare of*

*Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021); 31 U.S.C. § 3730(b). "The actions go by the hoary Latin term '*qui tam*'" and "[t]he party seeking to represent the government's interest is called a 'relator.'" *Molina Healthcare*, 17 F.4th at 739. If a relator succeeds in proving the claim, the relator receives a percentage – typically a substantial share – of the recovery. *Id.*; *see also* 31 U.S.C. § 3730(d).

Glasper and Wyckoff allege that St. James presented or caused to be presented a false or fraudulent claim for payment (Count I), made or used a false record or statement material to a false claim (Count II), and used a false record to avoid an obligation to pay money to the United States (Count III). *See* Am. Cplt. at ¶¶ 79–91 (Dckt. No. 36). In Count IV, Glasper contends that she was constructively terminated in retaliation for complaining about the misconduct. *Id.* at ¶¶ 92–97. In Count V, Wyckoff alleges that Paragon fired her – at St. James's direction – after she complained about the billing practices. *Id.* at ¶¶ 98–103.

St. James argues that Counts I–III fail to satisfy the rigorous pleading standards of Rule 9(b). As the company sees it, the amended complaint "lacks specifics required under Rule 9(b)'s heightened pleading requirements about the details of the act, when it occurred, who engaged in them, [or, in other words: the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated]." *See* Def.'s Mtn. to Dismiss, at 1–2 (Dckt. No. 47) (bracketed material in original).

St. James contends that Counts IV and V fall short because Glasper and Wyckoff did not provide enough facts to support their retaliation claims. *Id.* at 9. Along the way, the company points out that Wyckoff was employed by Paragon, a third party, rather than St. James. *Id.* As St. James sees it, Wyckoff can't bring a retaliation claim because she wasn't an employee.

9

The Court will address the claims in that order.

## I.      Fraud Under the False Claims Act (Counts I–III)

The first set of claims involves allegations of fraud.  The False Claims Act "makes it unlawful knowingly (1) to present or cause to be presented a false or fraudulent claim for payment to the United States, (2) to make or use a false record or statement material to a false or fraudulent claim, or (3) to use a false record or statement to conceal or decrease an obligation to pay money to the United States."  *Molina Healthcare*, 17 F.4th at 739; *see also* 31 U.S.C. § 3729(a).

Counts I–III track the statutory language.  The complaint alleges that St. James knowingly presented false claims (Count I), knowingly made or used a false record or statement (Count II), and knowingly made or used a false record to avoid an obligation to refund (Count III).  *See* Am. Cplt., at ¶¶ 79–91 (Dckt. No. 36).[2]

To establish liability under the False Claims Act, a relator "must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false."  *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011).

A relator must satisfy Rule 9(b)'s heightened pleading standards to prevail on a section 3729(a) claim.  *See Sibley*, 44 F.4th at 655.  "Though the exact details that must be included in a pleading vary based on the facts of a given case, plaintiffs must inject 'precision and some measure of substantiation into their allegations of fraud.'"  *Id.* (quoting *United States ex rel. Mamalakis v. Anesthetix Mgmt., LLC*, 20 F.4th 295, 301 (7th Cir. 2021)).

---

[2]  The amended complaint cites 31 U.S.C. § 3729(a)(2) for Counts II & III.  *See* Am. Cplt., at Counts II & III (Dckt. No. 36).  But that provision is about a reduction of damages if a defendant cooperates with the government.  Putting aside the citation, the language of the amended complaint in Counts II & III seems to track the statutory provisions of 31 U.S.C. § 3729(a)(1)(B) and (G).

Generalized allegations of fraud are not enough under Rule 9(b). *See Sibley*, 44 F.4th at 656; *see also United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (emphasizing the "need to allege 'the who, what, when, where, and how: the first paragraph of any newspaper story'"). To survive a motion to dismiss, a complaint must contain "specific representative examples" of false claims. *See Mamalakis*, 20 F.4th at 302. But "[t]o say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *Lusby*, 570 F.3d at 855 (emphasis in original).

"While the relator need not 'produce the invoices (and accompanying representations) at the outset of the suit,' it is nevertheless 'essential to show a false statement,' though this can be accomplished by including particularized factual allegations that give rise to a plausible inference of fraud." *Mamalakis*, 20 F.4th at 301 (quoting *Lusby*, 570 F.3d at 854); *see also Garst*, 328 F.3d at 376 (explaining that the district court directed the relator to, on each count, "(1) identify specific false claims for payment or specific false statements made in order to obtain payment; (2) if a false statement is alleged, connect that statement to a specific claim for payment and state who made the statement to whom and when; and (3) briefly state why those claims or statements were false").

In St. James's view, Counts I–III fail to satisfy the heightened pleading requirements of Rule 9(b). St. James contends that "[t]he Complaint contains mostly conclusions, rather than facts. And where facts are actually pled, the facts pled do not amount to any fraudulent conduct." *See* Def.'s Mtn. to Dismiss, at 5 (Dckt. No. 47); *see also* Def.'s Reply, at 3 (Dckt. No. 54) ("There are literally no facts pled of actions taken by any St. James employee, much less actions taken knowingly to further a fraud.").

11

Relators argue that they pled enough because they "provide specific examples of St. James providing therapy that was not medically necessary." *See* Pls.' Resp. to Def.'s Mtn. to Dismiss, at 11–12 (Dckt. No. 48). They believe that the amended complaint is similar to cases in which the Seventh Circuit allowed relators to proceed past the motion to dismiss stage. *Id.*

St. James gets it right.

Relators do give specific examples of patients who allegedly received unnecessary therapies as part of St. James's scheme to defraud the government. But Relators don't provide specific details linking the unneeded therapies to fraudulent conduct of St. James employees. In newspaper parlance, Relators have their *lede* – but they don't have the *nut graf* (meaning the "who, what, when, where, why and how").

The complaint is not entirely lacking in details. The complaint does identify several patients who allegedly received unneeded therapies. *See, e.g.*, Am. Cplt., at ¶¶ 54–78 (Dckt. No. 36). For example, Relators point to Patient A, who received speech therapy services after a hip replacement, even though speech therapy is typically given only after a patient suffered a stroke. *Id.* at ¶ 54. Patient A stayed at St. James for the full 100 days – the maximum period for reimbursement – even though her therapy progress notes indicated that she was likely to meet her therapy goals early. *Id.* at ¶ 73.

Relators allege that St. James padded Patient A's therapy goals, too. "Independence in toileting tasks" was added to Patient A's list of therapy goals even though she was already performing such tasks without any assistive device at the time of her first progress evaluation. *Id.* at ¶ 74.

As another example, the complaint highlights Patient F. A 71-year-old woman, Patient F was admitted to St. James in March 2017 after a hip replacement. *Id.* at ¶ 75. Patient F's therapy

notes show that she responded well to therapy and recovered to her previous level of functioning within a week. *Id.*

Still, St. James increased her therapy goals – including upping her "dressing goal" – even though she would be discharged to her home, where her spouse and adult children could assist if needed. *Id.* While Patient F and her family repeatedly asked that she be released from St. James, she was kept at the facility and told that Medicare would not cover her therapy if she left. *Id.* at ¶ 76.

An allegation of too much care, without more, is not enough to support a fraud claim. The complaint must muster enough specific facts to support a reasonable inference that patients received too much care because of fraud. But here, the complaint provides little or no information about who made the decisions for the individual patients, or when, or why. Basically, the complaint offers an overarching narrative of fraud, and then points to specific patients who received too much care, without linking the two with concrete facts.

The specific examples leave many of the questions required by Rule 9(b) unanswered. *Who* from St. James directed to keep these patients longer? *When* were these directives made? *Why* were these directives made (meaning, are there facts suggesting that fraud motivated the decisions)? For *how long* did St. James keep the patients after the directives?

The complaint does include an overarching observation that Janulis made a directive when she arrived in November 2015. *Id.* at ¶¶ 46–49. She directed the administrators of the facilities to implement "reimbursement strategies that resulted in high RUG scoring and longer stays, regardless of patients' needs." *Id.* at ¶ 47. At unspecified "meetings" at some point, Janulis "directed the managers of St. James to delay discharge of Medicare patients and increase the Medicare billings." *Id.* at ¶ 48.

13

Even so, the complaint does not link the timing of directives to the timing of the care for the patients. If anything, the timing seems tenuous. The complaint offers a basketful of examples, but all of the examples are from 2017, more than a year after Janulis made her first directive in 2015.

Patient A arrived in June 2017. *Id.* at ¶ 54. Patient B was admitted in June 2017. *Id.* at ¶ 55. Patient C began receiving care in February 2017. *Id.* at ¶ 56. Patient D received care in an unspecified year. *Id.* at ¶ 58. Patient E was admitted in May 2017. *Id.* at ¶ 71. Patient F came on board in March 2017. *Id.* at ¶ 75. Patient G got care in June 2017. *Id.* at ¶ 77. Patient H arrived in February 2017. *Id.* at ¶ 68.

That's a big stretch of time. And it is a stretch to infer that directives from 2015 had something to do with care in 2017. Maybe proximity in time could support an inference that Janulis's general directives had something to do with care for specific patients. But the greater the gap in time, the weaker the inference. And here, the complaint does not pin down when Janulis made her directives (or how often, or to whom), except to say that it began with her arrival in November 2015.

The lack of temporal proximity is especially important given the lack of an allegation that Janulis got involved with the care of any particular patient (with only a few exceptions). The complaint does not allege that Janulis made a directive about Patients A, B, C, D, E, F, G, or H. Instead, she made high-level directives about the scope and length of care generally. The complaint must allege more to tie those directives to the care of specific patients.

The complaint does tie Janulis to two patients, but the links are too light to carry any weight. Glasper informed Janulis that two patients were getting discharged to an assisted living home. But Janulis delayed the discharges, "stating that therapy is not complete until after a

14

home evaluation has been done." *Id.* at ¶ 48. At best, the complaint alleges that Glasper disagreed with Janulis about when the patients were ready to leave. That's not much of a basis for alleging fraud.

The other specific incident involving Janulis is thin, too. Janulis allegedly "threaten[ed] facility personnel with their jobs if ADL [activities of daily living] scores did not increase at the next report period." *Id.* at ¶ 49. Sometime later, one patient's scores when up from 0 to 4 in "one week." *Id.* Again, that allegation starts to sketch a story, but leaves out the details.

The complaint also does not point fingers at anyone else, except Janulis. That is, the complaint does not allege that any other named individual at St. James gave patients too much care, or directed others to do so, let alone did so for fraudulent reasons. There is no allegation that any specific person gave excessive care to Patients A, B, C, D, E, F, G, or H to run up the tab with Medicare.

At bottom, the complaint alleges that patients received too much care for too long. That allegation, standing alone, is not enough to give rise to a reasonable inference of fraud under Rule 9(b). The complaint does not buttress the allegation of excessive care with facts showing the existence of fraud. The Federal Rules require more than an allegation of too much care.

The complaint leaves the reader with too many unanswered questions. In *Mamalakis* and *Sibley*, the Seventh Circuit allowed relators to prevail on motions to dismiss because they answered questions that went unanswered here.

In *Mamalaki*s, the relator "lacked access to [the defendant] Team Health's billing records and thus [did] not identif[y] specific false invoices." *Mamalakis*, 20 F.4th at 301. However, "that omission [was] not fatal to the claim," as he "alleged that he ha[d] direct knowledge that anesthesiologists regularly falsely coded their procedures for billing purposes after TeamHealth

took over the practice group." *Id.* The complaint "provided some factual background about the change in approach to the delivery of anesthesia services under TeamHealth's ownership and the billing policies implemented by the new upper management." *Id.*

The *Mamalakis* relator initially pled facts that did not satisfy Rule 9(b). But the relator revised his complaint to provide "ten specific examples in which an anesthesiologist failed to comply – sometimes egregiously – with the requirements to submit a bill at the medical-direction rate. He alleged that each procedure involved a patient insured by Medicare or Medicaid and that he knew that each procedure was billed to the government." *Id.* at 302.

Those detailed examples "identif[ied] specific doctors and procedures and describing why each procedure should not have been billed as medically directed." *Id.* at 303. They "provide[d] a particularized basis from which to plausibly infer that at least on these occasions, TeamHealth presented false claims to the government." *Id.*; *see also Lusby*, 570 F.3d at 854 (holding that the relator had satisfied Rule 9(b) on his section 3729(a)(1) claim where the complaint included specific dates and details of payment – meaning, "the promise, the intent not to keep that promise, and the details of non-conformity" – even though the complaint did not include "the specific request for payment").

In *Sibley*, relators "effectively concede[d] they ha[d] not identified any specific patient debts that were unlawfully included in [University of Chicago Medical Center's] cost reports. The pertinent allegations involve[d] a 'failure of degree' related to understaffing, not an objective lack of compliance with the regulation in any specific case." *Sibley*, 44 F.4th at 656. The Seventh Circuit therefore held "that the allegations against [University of Chicago Medical Center] fail[ed] to adequately set out the requisite 'who, what, when, where, and how' of the fraud." *Id.* at 656–57.

By contrast, the *Sibley* relators survived dismissal on a separate claim against Trustmark. *Id.* at 660. They pled three specific examples of debts assigned to Trustmark and written off as Medicare bad debts without being subject to reasonable collection efforts. *Id.* at 653 ("The operative complaint gives three examples in which MBO and Trustmark . . . wrote off patient deductibles as Medicare bad debts fewer than 120 days after the date of service [in violation of the False Claims Act]. . . . Once Sibley and Trustmark CEO Justin Manning approved Bad Debt Write Off Reports, those amounts were automatically classified as Medicare bad debts. Later, the debts were included in Community Hospital's cost report for that accounting period.").

The claim against Trustmark survived because the relators "*specifically alleged* the mechanics of how Trustmark improperly declared these three patients' debts as Medicare bad debts and then incorporated them into Community Hospital's 2017 cost report, which sought reimbursement from the government." *Id.* at 660 (emphasis added).

Under *Mamalakis* and *Sibley*, Glasper and Wyckoff don't need to provide false invoices. But they do need to offer more than an overarching theory of the case. The complaint fails to identify a single specific directive given by an identified St. James employee to enroll a patient in unneeded therapy or delay a patient's discharge to maximize billing. Relators don't identify specific therapists who provided unnecessary care. The story is general, but Rule 9(b) demands specifics.

The allegations are consistent with fraud, but they're equally consistent with bad judgment, or maybe disagreement about the proper course of treatment. So they don't give rise to a plausible inference of fraud.

Too much care could be a sign of fraud – but it could be something else, too. The complaint needs to allege more to push the inferences across the line. Alleging facts that are

merely consistent with unlawful conduct is not enough under Rule 8, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and it isn't enough under Rule 9(b), either.

Maybe there is more to the story. And if there is, the Court will give Relators one more chance to say so. *See* Pls.' Resp. to Def.'s Mtn. to Dismiss, at 14 (Dckt. No. 48) (requesting dismissal without prejudice "[i]n the event this Court concludes that any of the counts in the First Amended Complaint are lacking").

Rule 15(a) of the Federal Rules of Civil Procedure states that the court "should freely give leave [to amend a pleading] when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). Leave to amend should be denied after a motion to dismiss only if "it appears to a certainty that the plaintiff cannot state a claim upon which relief can be granted." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 690 (7th Cir. 2004) (quoting *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1266 (7th Cir. 1978)); *see also Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 688 (7th Cir. 2014); *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015) (emphasizing the "liberal standard for amending under Rule 15(a)(2)" as the "best way to ensure that cases will be decided justly and on their merits").

Here, it does not "appear to a certainty that [Relators] cannot state a claim upon which relief can be granted." *Barry Aviation*, 377 F.3d at 690. Relators have provided several examples of specific patients who allegedly received unnecessary therapies at St. James. If Relators can link these examples to specific conduct of St. James employees – meaning, answer the who, what, why, where, when, and how – they might overcome the Rule 9(b) hurdle. So, the Court will grant them leave to amend.

One final note on Counts I–III. St. James argues that Relators' claims fail because all therapy "has to be prescribed by a physician" and "completed by licensed therapists . . . [who

are] not St. James Manor employees but were Paragon Therapy employees." *See* Def.'s Mtn. to Dismiss, at 9 (Dckt. No. 47); *see also* Def.'s Reply, at 4 (Dckt. No. 54) ("The residents receiving therapy that was ordered by their doctor is legally required of St. James.").

Relators contend that "a physician might order that a patient be initially admitted to a skilled nursing facility, but St. James itself must determine the scope of therapy necessary for each patient and the length of each patient's stay." *See* Pls.' Resp. to Def.'s Mtn. to Dismiss, at 11 (Dckt. No. 48); *see also* Am. Cplt., at ¶¶ 33, 37, 39 (Dckt. No. 36). That's right.

Relators explain that Medicare requires skilled nursing facilities, like St. James, to assess patients' conditions and need for services. *Id.* at ¶ 33. A doctor might prescribe therapy, but St. James decides whether to extend it and when patients can go home. A fraudulent extension of therapy violates the False Claims Act, even if the initial order from the physician was above board.

So, if Relators amend their complaint, they don't have to plead that St. James ordered therapy from the start. It is enough to allege that St. James fraudulently caused the therapy to unnecessarily continue. But again, a complaint must buttress a fraud claim with specific facts.

In sum, the Court grants St. James's motion to dismiss Counts I–III (Relators' claims arising under section 3729) without prejudice.

## II.     Retaliation (Counts IV and V)

The final two claims allege that St. James retaliated against Glasper and Wyckoff. They allege that St. James retaliated against them after they questioned whether patients needed more care. *See* Am. Cplt., at ¶¶ 92–103 (Dckt. No. 36).

The False Claims Act protects people who speak up by prohibiting retaliation. "Any employee, contractor, or agent shall be entitled to [] relief . . . if that employee, contractor, or

19

agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" as the result of their efforts to prevent a False Claims Act violation. *See* 31 U.S.C. § 3730(h)(1).

Rule 9(b)'s heightened pleading standards do not apply to claims under section 3730(h). *See Sibley*, 44 F.4th at 655 ("[A] § 3730(h) claim need not be pleaded with particularity under Rule 9(b)."). Instead, a court at the motion to dismiss stage will ask simply whether relators "provided 'some specific facts to support the legal claims asserted in the complaint.'" *Id.* at 662 (citing *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)); *see also Iqbal*, 556 U.S. at 678.

A retaliation claim under the False Claims Act simply needs to satisfy the ordinary pleading standards of Rule 8. The False Claims Act does not raise the bar when it comes to retaliation claims. Rule 8 is a low hurdle – but sometimes people trip over low hurdles.

"To determine whether an employee's conduct was protected, we look at whether '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016); *see also Babjak v. AbbVie, Inc.*, 2022 WL 3291739, at *3 (N.D. Ill. 2022); *Sibley*, 44 F.4th at 664. "So the question is both subjective (*i.e.*, tied to 'the employee') and objective (*i.e.*, tied to 'a reasonable employee')." *Burke v. Amedisys, Inc.*, 2022 WL 3226797, at *8 (N.D. Ill. 2022).

Relators then must allege that they were "fired 'because of' [their] 'other efforts to stop' potential FCA violations." *Sibley*, 44 F.4th at 664; *see also Uhlig*, 839 F.3d at 635 ("[A] plaintiff must prove that he was engaged in protected conduct and was fired 'because of' that conduct."); *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 848 (7th Cir. 2012) ("[An employee bringing a

retaliation claim under the False Claims Act] must show that his protected conduct was connected to [the employer's] decision to fire him.").

Relators assert that they tried to stop St. James's misconduct. Both Glasper and Wyckoff allege that they complained to their managers and supervisors at St. James about its fraudulent billing practices. *See* Am. Cplt., at ¶¶ 93, 99 (Dckt. No. 36). Glasper contends that St. James reduced her hours after these complaints, and Wyckoff claims that St. James ordered her employer (Paragon Rehabilitation) to fire her. *Id.* at ¶¶ 94, 100–01.

St. James argues that the allegations of the complaint do not allege retaliation. The Court will address the arguments about Glasper first, and then will turn to Wyckoff.

As the company sees it, Glasper merely alleged that "on an unknown date she 'complained' (said unknown things) to an unnamed 'supervisor(s)' and/or 'administrator(s)' and then, sometime after telling them her unknown statements, an unknown number of her hours were reduced, causing Ms. Glasper to resign." *See* Def.'s Reply, at 5–6 (Dckt. No. 54); *see also* Def.'s Mtn. to Dismiss, at 9 (Dckt. No. 47) ("Realtor [sic] Glasper alleges she made 'complaints' and concludes her hours were cut so she voluntarily quit. But there are no facts pled as to who she said anything to; what she said, and when she said it. There are no facts pled as to what her hours were before she complained and what they were after.").

Glasper has plausibly pled that she subjectively believed St. James was defrauding the government, and that her belief was objectively reasonable. But even under the lower Rule 8 pleading standard, Glasper has not provided sufficient facts to support a plausible inference that St. James retaliated against her "because of" her complaints.

The Court will start with Glasper's belief that St. James was committing fraud.

21

In her role at St. James, Glasper says that she reviewed treatment notes and prepared discharge papers, giving her personal knowledge of St. James's billing practices. *See* Am. Cplt., at ¶ 5 (Dckt. No. 36). Glasper alleges that Janulis (again, the VP) fraudulently delayed discharge of at least two patients after Glasper informed Janulis that those patients were ready to be released from St. James. *Id.* at ¶ 48. Glasper further alleges that she saw Janulis threaten to fire St. James employees if they didn't classify more patients as unable to perform daily activities – a classification that leads to higher RUG levels and thus higher Medicare bills. *Id.* at ¶ 49.

Relators also contend that St. James gave directives at weekly meetings to enroll patients in as many therapies as possible, regardless of patient needs. *Id.* at ¶ 53. Viewing those allegations in the light most favorable to Glasper, she has pled that she believed in good faith that St. James was violating the False Claims Act, and that her beliefs were objectively reasonable.

But Glasper has not done enough to plead that she was constructively fired because of her efforts to stop St. James's False Claim Act violations. *See* 31 U.S.C. § 3730(h).

Glasper claims that her hours were "reduced shortly after she complained that patients were receiving and being billed for therapy that they did not need and/or could not benefit from, or simply were not receiving at all." *See* Am. Cplt., at ¶ 62 (Dckt. No. 36); *see also id.* at ¶¶ 93–94. She alleges that her reduced hours amounted to a constructive firing from St. James. *Id.* at ¶¶ 4, 95.

But the complaint does not include enough facts to get the picture of what happened. Glasper complained to unidentified "administrators and supervisors." *Id.* at ¶ 93. At some point "[f]ollowing those complaints," someone at St. James reduced her hours. *Id.* at ¶ 94.

The complaint does not reveal who she complained to, or how often. The complaint does not divulge when she complained, or when her hours were reduced. The complaint does not disclose who reduced her hours, either, or whether that person knew about her complaints.

The timing question seems particularly important. Temporal proximity can support an inference of retaliation. If Company A took adverse action against Employee B shortly after she complained, the closeness in time can support an inference of a link. One thing led to another.

But here, the timing is up in the air. The complaint alleges in conclusory fashion that the company reduced her hours "shortly" after she complained. *Id.* at ¶ 62. Details would help, but details aren't there. And without details, it is not much of a story.

True, Rule 8 does not require the same rich factual narrative as Rule 9(b). A complaint does not have to answer all of the questions, and it does not have to muster evidence, either. Even so, sketching out a rough outline is the start of screenplay, but it is not a "story that holds together." *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

In *Sibley*, relator Sibley alleged that she knew her employer was fraudulently logging debts. *Sibley*, 44 F.4th at 663. She further alleged that she had complained to her supervisor, that the supervisor became angry because of her complaints, and that he fired her shortly thereafter. *Id.* These facts, the Seventh Circuit concluded, were enough to "permit an inference that Sibley was fired 'because of' her efforts to stop potential violations of the FCA." *Id.*

Another relator in *Sibley*, Collins, also pled specific facts to support an inference of retaliation. *Id.* at 664. Collins pled that she investigated her employer's noncompliance with regulatory requirements and reported the findings to her supervisor, who reacted negatively and demoted her (later firing her after she declined the demotion). *Id.*

In *Burke*, this Court concluded that the plaintiff had satisfied her burden under section 3730(h). *See Burke*, 2022 WL 3226797, at *1. The plaintiff there provided specific facts alleging that she was fired after she complained of False Claims Act violations to her supervisor, who told her to "shut up" and "stay out of it" if she wanted to "keep her job." *Id.* at *15.

Here, Glasper pled that she had personal knowledge of St. James's fraudulent billing practices based on her interactions with Janulis. *See* Am. Cplt., at ¶¶ 48–49 (Dckt. No. 36). She claims that she tried to stop those fraudulent billing practices by complaining to St. James administrators and supervisors. *Id.* at ¶ 93. And she contends that – because she complained about the alleged violations of the False Claims Act – she was paid for fewer hours, despite being required to do the same amount of work. *Id.* at ¶ 94.

But unlike in *Sibley* and *Burke*, Glasper doesn't plead facts showing a causal link between her protests and her constructive discharge. The complaint doesn't say anything about the timing of the protests or the cutback in hours. It doesn't say who Glasper complained to, or how that person (or those people) responded to her complaints. And critically, the complaint does not reveal whether the person who cut Glasper's hours knew that she had complained.

Taking the facts in the light most favorable to her, the complaint does not offer enough facts to support a plausible inference that she was constructively fired because of her complaints.

True, Glasper doesn't need to fully answer the "who, what, when, where, why, and how" – Rule 9(b)'s heightened pleading standard doesn't apply to section 3730(h). But she does need to plead specific facts supporting an inference that she was constructively fired "because of" her complaints about St. James's billing practices. And so far, she hasn't. So, Glasper has not plausibly pled a retaliation claim under section 3730(h).

The Court turns now to Relator Wyckoff's retaliation claim.

24

St. James argues that Wyckoff's retaliation claim fails because "she is not even an employee of St. James," so it "could not have fired her." *See* Def.'s Reply, at 6 (Dckt. No. 54). According to St. James, Relators pled no facts about St. James "having the ability or authority to 'make' Paragon do anything, much less terminate one of their own employees." *Id.*

True, Wyckoff was formally employed by Paragon. But that fact doesn't get St. James off the hook under the False Claims Act. The plain language of the Act provides relief for contractors and agents who are victims of retaliation – not just employees. *See* 31 U.S.C. § 3730(h). And St. James does not suggest that Wyckoff was not its contractor or agent.

It is "the decisionmakers' knowledge that is crucial." *Halasa*, 690 F.3d at 848. Wyckoff alleges that the ultimate decisionmaker was St. James. It doesn't matter that the causal chain had an extra link – Paragon – between St. James and Wyckoff. Another link adds a layer of complexity – but it doesn't sever the chain.

Here, Wyckoff alleges she was fired at St. James's direction. *See* Am. Cplt., at ¶¶ 100–02 (Dckt. No. 36). She contends that her "direct supervisor at Paragon Rehabilitation informed Relator Wyckoff that he did not want to terminate Relator Wyckoff but had been ordered to so by St. James Manor." *Id.* at ¶ 102.

Wyckoff wasn't a formal employee of St. James – but she *was* a contractor or agent of St. James. That's enough to bring her within the statute's protection.

Still, Wyckoff, like Glasper, hasn't alleged sufficient facts to show that St. James acted against her "because of" her efforts to stop violations of the False Claims Act. Plenty of questions remain: When did Wyckoff raise her complaints, and when did her supervisor fire her? To whom did Wyckoff complain? How did the person to whom Wyckoff complained respond?

Like Glasper, Wyckoff does not need to answer the "who, what, when, where, why, and how." But she must allege specific facts supporting a plausible inference of retaliation.

And on that front, the complaint falls short. It merely alleges that Wyckoff made an unspecified complaint to some unspecified persons on an unspecified date, that she was fired from Paragon at some unspecified later date, and that an unnamed supervisor said that he was ordered to fire her by St. James. *Id.* at ¶¶ 99–102. Taking all well-pleaded facts as true, there's not enough to create a plausible inference of retaliation.

As discussed above, Rule 15(a) of the Federal Rules of Civil Procedure states that the court "should freely give leave [to amend a pleading] when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) sets forth a "liberal standard" for amending "to ensure that cases will be decided justly and on their merits." *Runnion*, 786 F.3d at 520. Leave to amend should be granted unless "it appears to a certainty that the plaintiff cannot state a claim upon which relief can be granted." *Barry Aviation*, 377 F.3d at 690.

While Relators did not plead sufficient facts in support of Counts IV and V, it does not "appear to a certainty" that they cannot do so. So, the Court will grant leave to amend.

In sum, the Court dismisses Counts IV and V without prejudice.

## Conclusion

For the foregoing reasons, the Court grants Defendant St. James's motion to dismiss the amended complaint. The dismissal is without prejudice. The Court grants Relators leave to amend within two weeks.


Date:   September 8, 2023                     _____
                                             Steven C. Seeger
                                             United States District Judge

26